## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

L.M., by her next friend
and parent, A.M.,
     Plaintiff,

v.

LYFT, INC.,
     Defendant.

Case No. 2:26-cv-10477

Hon.

---

| | |
|---|---|
| Elizabeth K. Abdnour (P78203)<br>Nicole Cote (P86815)<br>Jessica Moore (OH: 0101098)<br>ABDNOUR WEIKER LLP<br>325 E. Grand River Ave., Suite 250<br>East Lansing, MI 48823<br>517-994-1776<br>liz@education-rights.com<br>nicole@education-rights.com<br>jessica@education-rights.com | Kristen Feden (NJ: 091312009)<br>Ashley Ann Garland (NJ: 423002023)<br>ANAPOL WEISS<br>130 North 18th Street, Suite 1600<br>Philadelphia, PA 19103<br>215-735-1130<br>kfeden@anapolweiss.com<br>agarland@anapolweiss.com |

*Attorneys for Plaintiff*

---

## COMPLAINT AND JURY DEMAND

Plaintiff L.M.[1], by her next friend and parent, A.M.,[2] through her attorneys, ABDNOUR WEIKER LLP and ANAPOL WEISS, hereby files the following Complaint against Defendants as captioned above.

---

[1] L.M. is a pseudonym.
[2] A.M. is a pseudonym to protect the identity of L.M., a minor victim of sexual abuse.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367 because the state law claims asserted by Plaintiff form part of the same case or controversy as the federal claims.

3. Plaintiffs reside in the Eastern District of Michigan, 28 U.S.C. § 1391(c)(1). A substantial part of the events and omissions giving rise to the claims occurred in the Eastern District of Michigan, 28 U.S.C. § 1391(b)(2).

## INTRODUCTION

4. This action arises from a horrific and entirely preventable incident on February 13, 2023, when Defendant Lyft, Inc. ("Lyft") facilitated the transport of a 14-year-old child, L.M., into the hands of a sexual predator.

5. Lyft's driver—acting under the company's platform, control, and policies—delivered L.M. directly to her abuser.

6. Lyft's own policies explicitly prohibit unaccompanied minors from using its platform.[3] Yet, in practice, Lyft has failed to implement and enforce meaningful safeguards to uphold this policy. The driver neither verified

---

[3] Safety Policies: Age Requirement, LYFT, https://help.lyft.com/hc/en-us/all/articles/115012923127-Safety-policies#age (last visited January 16, 2026).

L.M.'s age nor questioned the circumstances of a visibly young child entering the vehicle alone. Worse still, after observing signs of distress and asking L.M. if she was okay, the driver failed to alert law enforcement or even report the incident to Lyft—an omission enabled and compounded by Lyft's own lack of monitoring, oversight, and emergency reporting procedures.

7. Lyft's failure to enforce its policies was not an isolated lapse—it was the direct cause of L.M. being delivered into the hands of Mouad, who sexually exploited and brutally abused her. This outcome was foreseeable, preventable, and directly tied to Lyft's corporate misconduct and disregard for passenger safety.

8. Lyft profited from this ride. Lyft enabled the ride. And Lyft bears responsibility for the outcome. But for Lyft's role in transporting this minor—alone, unsupervised, and under blatantly suspicious circumstances—this exploitation would not have occurred.

9. While Lyft publicly proclaims that "safety is our top priority," and "it is our goal to make every ride safe, comfortable and reliable," its actions reveal a different truth: profit and growth take precedence over basic protections for the most vulnerable of its riders.[4]

---

[4] Lyft Driver Services, LYFT, https://www.lyft.com/driver/why-drive-with-lyft (last visited Jan. 16, 2026).

10. Lyft knew, or should have known, that allowing unaccompanied minors to use its service posed an unacceptable risk of harm. Indeed, the company had access to prior reports, legal proceedings, and public warnings about the dangers of minor exploitation on rideshare platforms. Lyft willfully ignored these red flags.

11. This was not a tragic accident. It was the predictable result of Lyft's conscious decision to prioritize expansion and revenue over compliance with its own safety policies and over the welfare of a child who inevitably became collateral damage.

12. As a result of Lyft's gross negligence, L.M. suffered catastrophic and life-altering harm—both physical and psychological. This complaint seeks to hold Lyft fully accountable for the immense pain and trauma its failures have inflicted.

13. This case further exposes systemic flaws in Lyft's security protocols, risk management systems, and corporate governance. It reflects a company that publicly disavows child passengers while privately permitting, facilitating, and profiting from their exploitation.

14. Lyft owed a clear duty of care to L.M. and other minors, as foreseeable victims of foreseeable harm. That duty was violated in the most egregious manner,

and Plaintiff seeks both compensatory and punitive damages to redress the harm and prevent others from suffering the same fate.

## PARTIES

15. Plaintiff, A.M., is the mother of minor child L.M. and is a citizen of the State of Michigan and Livingston County.

16. Plaintiff L.M., is a minor citizen of the State of Michigan and Livingston County. The assault occurred in Wayne County, in the State of Michigan.

17. Defendant Lyft, Inc. ("Lyft") is a Delaware corporation engaged in the business of matching participating Lyft-approved drivers and vehicles with passengers seeking transportation for a fee, has its principal place of business in San Francisco, California, and is a citizen of the states of Delaware and California.

## FACTUAL ALLEGATIONS

18. At the time of the events giving rise to this action, Plaintiff L.M. was a 14-year-old child—innocent, vulnerable, and deserving of protection. Instead, she was delivered into the hands of a predator by Lyft.

19. Lyft is a multi-billion-dollar ride-hailing corporation headquartered in San Francisco, California. It is among the fastest-growing companies in the United States and operates in hundreds of cities nationwide, facilitating millions of rides annually.

20. In exchange for a fee, Lyft promises its riders—especially parents and families—safe, reliable transportation. At the core of its business model is the assurance that passengers will be transported securely from point A to point B.

21. For L.M., that promise was broken in the most devastating way imaginable.

### A. <u>Lyft's Egregious Disregard for Safety and Deliberate Failure to Enforce Its Own Policies</u>

23. Lyft markets itself as a safety-first company, claiming that it is committed to protecting its passengers—particularly vulnerable individuals like children—from harm.

24. Through public statements, website disclosures, and promotional materials, Lyft projects an image of corporate responsibility, suggesting the existence of strict internal controls and safeguards.

25. In reality, these safety assurances are dangerously misleading.



**Hear from our leadership**

"At Lyft, we're on a mission to become the safest way to get around. Safety is foundational to how we design our features, support our community, and build trust with every ride. We're continuously investing in tools, technology, and experiences that help both riders and drivers feel secure from start to finish."

— Michaela Smiley, Head of Community Safety

[5]

26. Despite its public-facing assurances, Lyft has repeatedly failed to enforce its own safety policies, creating conditions where unaccompanied minors like L.M. can be easily exploited.

27. This failure was not an isolated oversight—it was part of a systemic pattern of reckless disregard for the very rules Lyft claims to uphold.

**B. Lyft's So-Called "Safety Policies" for Unaccompanied Minors**

28. Lyft's "Safety Policies," prominently displayed on its website, expressly prohibit the transportation of unaccompanied minors.

29. The policy states: "Passengers must be at least 18 years old to sign up for a Lyft account, including Lyft Family accounts. We don't allow passengers under the age of 18 to take Lyfts without an adult."

---

[5] Safety, LYFT, https://www.lyft.com/safety (last visited Jan. 16, 2026).

**Age requirement**

Passengers must be at least 18 years old to sign up for a Lyft account, including Lyft Family accounts.

We don't allow passengers under the age of 18 to take a ride on the Lyft platform without an adult.

If a driver believes a passenger might be underage, the driver should ask the passenger to confirm their age.

Riders who receive multiple reports for appearing to be underage will need to go through an additional identity verification process. During the verification process, the rider won't be able to take rides until a Lyft agent reviews their submitted verification document.

The driver shall also let a passenger know that the driver will have to cancel the trip if the passenger is indeed under 18.

In addition, drivers can report requests to transport unaccompanied minors by tapping 'Contact Support' below.

[6]

30. This rule exists for a reason: to protect children from foreseeable harm.

31. Lyft assigns responsibility to its drivers to enforce this policy.

32. According to company guidance, drivers are told that if they suspect a passenger is underage, they may ask the passenger to verify their age.

33. Lyft further instructs drivers that if a passenger is confirmed or suspected to be under 18, the driver should cancel the ride.

34. These directions are communicated through training materials, internal FAQs, and online driver forums such as Reddit.

---

[6] Safety Policies: Age, Lʏꜰᴛ https://help.lyft.com/hc/en-us/all/articles/115012923127-Safety-policies#age  (last visited Jan. 16, 2026).



35. In addition, drivers are told to report any requests to transport unaccompanied minors to Lyft Support—so that the company can take appropriate action and prevent further violations.



36. But Lyft does not meaningfully enforce these policies.

37. Despite the clarity of its rules, Lyft has created a platform that punishes drivers for cancellations, incentivizes silence, and allows predators to exploit gaps in enforcement.

38. Lyft failed to take any meaningful action when L.M.—a visibly unaccompanied, anxious, 14-year-old child—was transported by one of its drivers.

39. That failure was not just a violation of Lyft's policies.

40. It was a gross betrayal of the public trust—and a direct cause of the catastrophic harm that followed.[7]

### C. Lyft's Business Model and Safety Practices Were Designed to Fail—and Did

41. Lyft publicly claims that safety is its top priority and that unaccompanied minors are not permitted to use its service. But these statements are belied by the company's internal systems, which not only fail to enforce that policy—they actively discourage it.

42. Drivers are penalized for cancelling rides, even when they do so to protect minors from harm. Cancellation thresholds are rigidly enforced, and drivers who exceed them risk deactivation. This includes situations where drivers

---

[7] *See* David Ingram, *Lyft and Uber Say They Train Their Drivers to Spot Human Trafficking. Abusers Sometimes Bypass the System.*, NBC NEWS (May 3, 2024), https://www.nbcnews.com/tech/tech-news/lyft-uber-say-train-drivers-spot-human-trafficking-abusers-sometime-rcna82895 (Despite Lyft's policy prohibiting unaccompanied minors from using its service, sexual abusers have exploited the platform to transport teenagers and children, bypassing safety measures and violating the company's terms of service. An investigation by NBC News identified multiple instances since 2017 where adults accused of planning sexual abuse hired Lyft drivers to transport unaccompanied minors. The FBI issued an alert in 2022 warning that rideshare services are being used to facilitate child abduction, noting that potential abusers believe these services offer more privacy from witnesses than traditional transportation modes. These incidents highlight the urgent need for Lyft to strengthen its safety protocols and enforcement mechanisms to prevent exploitation through its platform and ensure the safety of all users).

refuse rides from visibly underage, unaccompanied children—exactly the type of ride Lyft purports to prohibit.

> **Important:** If you cancel 15 or more of your last 100 accepted rides — not including passenger no-shows — your account could be at risk, so it's important to choose carefully.
>
> **Reasons to cancel a ride**
> We recommend using your best judgment when cancelling rides.
>
> - Emergency: If you have an emergency and cannot pick up a ride you have already accepted, you can always cancel the ride.
> - Safety: There are a number of concerns that are perfectly acceptable if you need to cancel a ride, including:
>     - Your passenger makes you feel uncomfortable
>     - Your passenger is an unaccompanied minor (17 and under)
>     - There isn't a car seat for a child they are traveling with
>     - There aren't enough seat belts for the people in your passenger's party (if that's the case, they should order a Lyft XL)
>
> If you cancel for any of the above reasons, make sure to reach out to our support team so they're aware and can review the request.

43. Drivers who exceed certain cancellation thresholds risk being deactivated from the platform. The burden of justifying a cancellation falls squarely on the driver, who must navigate a cumbersome and opaque dispute process to avoid punishment.

44. Even more troubling, Lyft also ties driver eligibility to passenger star ratings. A single low rating—often the result of a passenger's frustration over a canceled ride—can trigger consequences ranging from reduced access to high-demand rides to full deactivation.

45. This punitive system sends a chilling message to drivers: prioritize ride acceptance and customer satisfaction, even if it means breaking safety rules or endangering children.

46. Lyft's training materials reinforce this pressure. Drivers are repeatedly instructed to keep cancellation rates low and acceptance rates high. Nowhere is there meaningful instruction or support on when and how to refuse a ride due to safety concerns—leaving drivers vulnerable to retaliation and confusion.

47. This issue has been widely discussed in online driver forums such as Reddit, where Lyft drivers share their fears of being penalized or deactivated for refusing rides involving visibly underage passengers.



48. Despite participating in these forums, Lyft representatives have consistently failed to clarify how drivers should handle such situations. Many drivers report facing disciplinary consequences after declining rides involving minors, even when acting in good faith.

49. The result is an unsafe environment where drivers—under pressure to protect their income—are strongly discouraged from questioning passengers' ages or refusing rides to unaccompanied minors.

### D. **Lyft Exercises Control—But Abandons Responsibility**

50. Lyft cannot escape liability by pretending its drivers act independently. The company exerts substantial control over its drivers, from setting fares and dictating conduct policies to prohibiting any rides arranged outside its app.

51. Lyft maintains full control over the transportation experience it provides. Drivers cannot adjust pricing, solicit business independently, or opt out of core platform rules—yet Lyft refuses to accept the responsibilities that come with this control.

52. Despite the power it wields, Lyft has deliberately failed to enforce the most basic safety measures—policies that, if followed, would have protected children like L.M.

53. Instead, Lyft misrepresented its commitment to safety while knowingly cultivating a system that punished drivers for refusing unsafe rides. In doing so, it created a foreseeable and dangerous pathway for predators to exploit.

54. Worse still, Lyft was on clear notice of the risks.

55. As early as October 25, 2022, the Federal Bureau of Investigation ("FBI") issued a public safety alert titled *"Criminal Actors Leverage Rideshare*

Vehicles to Abduct Minors."[8] The alert specifically warned that rideshare services were being used to facilitate child abduction and trafficking.

56. Despite this federal warning, and its own internal knowledge of similar incidents, Lyft continued to enforce policies that punished caution and rewarded silence.

57. Lyft prioritized corporate profits over the safety of minors. Its business model, internal enforcement system, and public representations stand in direct conflict. The result was not merely negligence—it was willful and reckless misconduct.

58. This misconduct was a substantial factor in the horrific exploitation of L.M. and reflects a broader corporate indifference that must be met with accountability.

E. **The Family's Nightmare: The Devastating and Tragic Sexual Abuse of L.M.: A Direct Consequence of Lyft's Pervasive, Egregious, and Systemic Negligence**

59. On or around February 13, 2023, L.M., an innocent 14-year-young girl, was lured into an online relationship by a predatory man, M.[9]

---

[8] FEDERAL BUREAU OF INVESTIGATION, PUBLIC SERVICE ANNOUNCEMENT: CRIMINAL ACTORS LEVERAGE RIDESHARE VEHICLES TO ABDUCT MINORS, ALERT NO. I-102522-PSA (Oct. 25, 2022), https://www.ic3.gov/PSA/2022/psa221025.
[9] M. is a pseudonym.

60. M. groomed L.M. through social media, manipulating her trust and coercing her into meeting him in person. Unbeknownst to her parents, M. enticed L.M. into a dangerous situation that would forever alter her life.

61. Under false pretenses and using his personal Lyft account, on or around February 13, 2023, M. arranged for L.M. to be transported from her home in Brighton, Michigan, to his location in Dearborn, Michigan.

62. Upon information and belief, Lyft failed to implement proper training, supervision, and mandatory reporting protocols, allowing the driver of the Lyft M. ordered to overlook clear red flags.

63. Despite noticing that the unaccompanied 14-year-young child appeared anxious and apprehensive—enough to ask if she was okay—the driver failed to question why a minor was being transported instead of the adult male account holder associated with the ride.

64. Upon information and belief, the driver did not verify L.M.'s age or identity, nor did they cancel the trip upon realizing she was unaccompanied.

65. This gross negligence allowed L.M. to be transported directly to a predator who inflicted unspeakable harm upon her.

66. Upon information and belief, the driver neither reported the horrific ordeal to Lyft nor contacted law enforcement, missing a critical opportunity to intervene.

67. These actions directly violated of Lyft's explicit policies prohibiting the transportation of unaccompanied minors.

68. When she arrived home and realized L.M. was missing, A.M. panicked

69. A.M. checked L.M.'s devices and determined that L.M. had been picked up by a Lyft.

70. Immediately, A.M. called Lyft to inform them of the situation and seek assistance in getting L.M. home safely.

71. A.M. called over and over, repeatedly being transferred to a call center, where each individual with whom she spoke refused to cancel the ride or intervene in any way, despite her repeatedly stating that her underage daughter was being transported to an unknown location without the knowledge or consent of her parents.

72. As a direct result of Lyft's negligence in enforcing its safety policies, the driver delivered L.M. directly to M., who subjected her to horrific sexual exploitation and abuse, raping her and photographing her naked.

73. L.M.'s ordeal was profoundly traumatizing, causing her severe physical injuries and deep psychological scars. The betrayal of trust and the unimaginable suffering she endured have irrevocably altered the course of her young life.

74. Following the sexual assault, L.M.'s mental health deteriorated significantly, resulting in severe depression, suicidal ideation, and formal diagnoses of post-traumatic stress disorder ("PTSD"), severe anxiety, generalized anxiety, and major depressive disorder.

75. In January 2024, right before her fifteenth birthday, L.M. attempted to take her own life, which resulted in her admission to a psychiatric hospital, where she remained for a week.

76. To this day, L.M continues to need extensive psychiatric intervention, including two to four hours per week of intensive home-based therapy.

77. L.M.'s trauma manifests through flashback nightmares; self-harming behaviors, including cutting; and profound changes to her personality and mood, with increasingly severe episodes of depression and outbursts of anger and aggression directed toward A.M.

78. The assault profoundly disrupted L.M.'s educational and social development, as she spends most of her time at home.

79. L.M. continues to require intensive therapeutic intervention to address her damaged self-worth and self-confidence. Her condition demonstrates the persistent and ongoing nature of the emotional and psychological harm caused by the sexual abuse, requiring continuous monitoring and treatment to address the severe damage inflicted.

**F. <u>Lyft's Corporate Indifference Was a Direct Cause of L.M.'s Exploitation</u>**

80. L.M.'s abuse was not the result of a single failure; it was the expected outcome of Lyft's corporate architecture, including:

    a. A business model that punished drivers for cancelling unsafe rides;

    b. A platform that provided no real training, tools, or backup for age verification;

    c. A leadership team that ignored federal warnings and prior lawsuits;

    d. A customer service team that refused to intervene despite being repeatedly notified of multiple serious violations of safety policies and severe danger to a minor child; and

    e. A safety policy that was not enforced but exploited.

81. Lyft's gross negligence, willful indifference, and systemic failures, compounded with its failure to train its drivers on how to handle rides involving unaccompanied minors, directly enabled the exploitation of a vulnerable child. Its refusal to act—despite knowing the risks—was not just reckless. It was unconscionable.

82. A.M. seeks to hold Lyft fully accountable for the devastating harm caused—not only to L.M., but to the public trust and safety it continues to endanger.

83. It was entirely foreseeable to Lyft that its failure to enforce safety policies prohibiting the transportation of unaccompanied minors would lead to severe harm to children like L.M.

84. The risks were not speculative—they were documented, repeated, and publicly reported.

85. Lyft had unequivocal knowledge of the dangers associated with transporting minors alone, as demonstrated by prior legal actions, government warnings, and media investigations. Yet it took no meaningful action to address these dangers.

86. In a 2020 lawsuit filed in Philadelphia, Pennsylvania—three years before L.M.'s exploitation—Lyft was sued for negligence after an eleven-year-old girl was sexually assaulted by a predator who used his personal Lyft account to arrange rides for her. The drivers failed to verify the minor's age, did not question why a child was traveling alone, and transported her without parental consent.[10]

87. The *Jones* case exposed precisely how predators could exploit Lyft's platform to access and harm children. It placed the company on clear and direct notice of the vulnerabilities in its system and the urgent need for safeguards.

88. Still, Lyft did nothing.

---

[10] *Jones v. Lyft*, No. 200501044 (Phila. Ct. of Common Pleas 2020).

89. It failed to implement any meaningful age verification protocols. It continued to enforce performance metrics that penalized safety-driven cancellations. It left its safety policies toothless—unenforced, unsupported, and ultimately ineffective.

90. Independently of the *Jones* lawsuit, prominent news organizations repeatedly published reports highlighting how rideshare services were being used to target minors. One investigation by NBC News detailed several cases where predators used platforms like Lyft to abduct and assault children.[11]

91. These public reports generated national attention and offered Lyft every opportunity to correct course.

92. Instead, Lyft continued operating with blind indifference to the consequences.

93. The most striking warning came on October 25, 2022, when the Federal Bureau of Investigation issued a nationwide Public Service Announcement titled "Criminal Actors Leverage Rideshare Vehicles to Abduct Minors."[12] The FBI warned that, since the onset of the COVID-19 pandemic, law

---

[11] *See* David Ingram, *Lyft and Uber Say They Train Their Drivers to Spot Human Trafficking. Abusers Sometimes Bypass the System.*, NBC NEWS (May 3, 2024), https://www.nbcnews.com/tech/tech-news/lyft-uber-say-train-drivers-spot-human-trafficking-abusers-sometime-rcna82895.

[12] FEDERAL BUREAU OF INVESTIGATION, PUBLIC SERVICE ANNOUNCEMENT: CRIMINAL ACTORS LEVERAGE RIDESHARE VEHICLES TO ABDUCT MINORS, ALERT NO. I-102522-PSA (Oct. 25, 2022), https://www.ic3.gov/PSA/2022/psa221025. (On October 25, 2022, the FBI's Internet Crime Complaint Center (IC3) issued a Public Service Announcement warning that rideshare services are being exploited to facilitate violent crimes, including human trafficking and child abduction. The announcement highlights that criminals are using these platforms to transport victims with less risk of detection, believing that rideshare services offer more privacy than traditional transportation methods. The FBI urges rideshare companies to enhance security measures and encourages drivers to remain vigilant by verifying passenger identities and reporting any suspicious activities. The PSA also provides safety recommendations for passengers to protect themselves from potential threats when using rideshare services).

enforcement had received multiple reports of rideshare services being used to facilitate child abductions:

> *The FBI warns the public and rideshare companies of criminal actors leveraging rideshare vehicles to abduct minor victims. . . . Since the onset of the COVID-19 pandemic, law enforcement received several reports of rideshare services being used to facilitate child abduction.*[13]

94. These warnings were not ague or abstract. It was a clear directive, aimed at Lyft and its competitors, urging immediate attention and reform.

95. Yet Lyft continued to operate as if none of it mattered.

96. The prior lawsuits, public reports, and federal warnings—individually and collectively—imposed a duty on Lyft to take proactive steps to safeguard minors and vulnerable riders. Lyft ignored that duty.

97. Instead, it preserved a system that was easy for predators to manipulate, impossible for drivers to enforce safely, and devastating for victims like L.M.

98. By neglecting to provide proper oversight, meaningful training, and structural support for policy enforcement, Lyft did not merely fall short of its obligations—it abandoned them entirely.

---

[13] *Id.*

99. This systemic negligence is further exemplified by A.M.'s distressing experiences, when she encountered severe shortcomings in Lyft's safety mechanisms.

100. On or around February 13, 2023, in response to her legitimate concerns regarding the safety of her daughter, A.M. made a formal report to Lyft (Request ID: 196506456).



101. As part of the report, she informed Lyft that her ***minor*** daughter had been trafficked through Lyft and sexually assaulted by a pedophile. She also informed them that her daughter was undergoing a sexual assault forensic exam and that law enforcement was involved.



102.    Instead of providing support and assistance, Lyft ignored A.M.



103.    When Lyft finally responded to A.M., its representatives questioned her as if she had never provided any initial information, further traumatizing a mother who was trying to be strong and support her 14-year-old daughter, who had just been trafficked and sexually assaulted, whose abuse had been facilitated by Lyft.

104.    Lyft's representative wrote:



105.    In response, A.M. had to ask the obvious:



106.    Lyft's representatives repeatedly retraumatized A.M. as she was compelled to recount L.M.'s harrowing experiences twice.



107.     Receiving no response, A.M. contacted Lyft on Twitter to alert it of

what Lyft itself characterized as a "terrifying… ordeal."



108.     Not until days later, after contacting Lyft on Twitter—during which

Lyft representatives asked A.M. the *same* re-traumatizing questions—did

Lyft's Safety Team contact A.M., again asking her the same questions she had

already answered.



109.     That communication was the last time A.M. heard from Lyft.

110.     Lyft's process not only failed to address L.M.'s immediate safety issues but also inflicted severe, unnecessary emotional distress on a terrified mother seeking help after her daughter had been trafficked and raped.

111.      Lyft representatives' incessant demands that A.M. repeat, over and over, the details of her daughter's traumatic ordeal highlights Lyft's utter incompetence at handling sensitive, urgent reports of children at risk. This emphasizes a broader failure within Lyft's safety infrastructure to provide meaningful assistance to riders in distress.

112.     Lyft's deficient training and support for drivers exacerbate these safety inadequacies.

113.     Lyft expects its drivers to identify and respond to potential threats without robust verification tools or comprehensive training, leaving them ill-equipped to handle complex and sensitive situations effectively.

114.     The absence of stringent verification processes and the reliance on drivers to self-regulate without adequate training and oversight has resulted in numerous instances where safety protocols were ignored or inadequately enforced. This lack of robust safety measures not only endangers minors but also erodes public trust in Lyft's ability to safeguard its riders.

115.    The cumulative effect of these failures is a pattern of neglect that prioritizes operational efficiency and profitability over the safety and well-being of Lyft riders.

116.    Lyft's failure to implement and maintain effective safety measures allows abusers easy access to minors, directly creating serious risk to children like L.M.

117.    Lyft must address these critical shortcomings by overhauling its safety protocols, enhancing driver training, and establishing more reliable verification systems to prevent future instances of abuse and ensure the protection of all riders.

118.    Once A.M. finally found and rescued L.M. and brought her home, the full breadth of L.M.'s abuse became clear.

119.    Both L.M. and A.M. plunged into despair, experiencing long-lasting and profound emotional and psychological turmoil and anguish due to M.'s rape and sexual exploitation of L.M.

120.    Lyft's gross negligence and willful disregard for its own safety policies directly facilitated the heinous acts perpetrated by M. against L.M.

121.    Lyft's failure to comply with a basic duty of care towards its minor riders, such as L.M., not only enabled a predator to exploit a vulnerable child but also inflicted profound and lasting harm upon L.M. and her family. The

devastating consequences of this incident underscore the urgent need for Lyft to be held accountable for its actions and for it to implement meaningful changes to protect minors from abuse in the future.

## CAUSES OF ACTION

### COUNT I

**Violation of the Trafficking Victims
Protection Reauthorization Act
18 U.S.C § 1595 ("TVPRA")**

122.   All paragraphs are incorporated by reference.

123.   Plaintiff L.M. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

**Lyft's Direct Participation in Sex Trafficking Venture**

124.   Defendant Lyft participated directly in the sex trafficking venture by knowingly transporting L.M. to M. for the purpose of commercial sexual exploitation.  As this Court recognized in *Doe v. Dabbagh*, No. 2:15-cv-10724 (E.D. Mich. 2016), "[H]uman trafficking cannot exist on the scope on which it does without help from facilitators, who, for profit or personal benefit, lend their services and resources to human traffickers while turning a blind eye to the fact that they are supporting the commodification of human beings."

28

125.     Under 18 U.S.C. § 1591(a)(1), Lyft "transported" L.M., a minor, knowingly or in reckless disregard of the fact that she would be caused to engage in a commercial sex act.

126.     Lyft had actual or constructive knowledge that this venture was for the purposes of sex trafficking due to the clearly suspicious nature of the transportation request. Factors such as L.M. being an unaccompanied minor, the transport being arranged by an unknown adult male, the isolated destination, and L.M.'s demeanor throughout the course of the ride should have alerted Lyft to the illegal intentions of the perpetrator.

127.     Lyft's driver actively facilitated the sex trafficking venture by completing the ride despite obvious indicators of potential child sexual exploitation.

**Financial Benefit from Trafficking Venture**

128.     In the alternative, Lyft "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture" that engaged in sex trafficking within the meaning of 18 U.S.C. § 1595(a).

129.     Lyft had a statutory obligation not to benefit financially from a venture that it knew or should have known violated 18 U.S.C. § 1591(a). The "knowingly benefits" provision of § 1595(a), added in the 2008 TVPRA

amendments, specifically targets third parties who financially benefit from trafficking ventures.

130.    Lyft breached its duty by participating in and/or facilitating the L.M.'s trafficking and transportation for the purpose of commercial sexual exploitation induced by force, fraud, and/or coercion, through its acts, omissions, and/or commissions.

131.    Lyft received payment for the ride that directly facilitated L.M.'s trafficking and abuse. Lyft's receipt of payment for transporation services that facilitated the trafficking constitutes the requisite financial benefit under § 1595(a).

132.    The "venture" included M., Lyft, and Lyft's driver working in concert to transport L.M. to the location where she would be sexually exploited. Under federal court interpretations, a "venture" encompasses collaborative undertakings between trafficking perpetrators and facilitating parties.

133.    Lyft knew or should have known that this venture included sex trafficking based on the obviously suspicious circumstances of the transportation request, general knowledge that its platform could be used for trafficking, prior incidents or reports of similar misconduct, and the obvious indicators that an adult was arranging transportation of an unaccompanied minor for illicit purposes. Federal courts apply a "knew or should have

known" standard that permits liability based on constructive knowledge established through red flags, industry warnings, or willful blindness, consistent with the broad remedial purpose of the TVPA.

134.    Lyft's financial benefit from this venture, combined with its knowledge and/or willful blindness to the trafficking purpose, establishes liability under § 1595(a). As demonstrated in cases like *Doe v. Dabbagh*, facilitators who profit from providing services essential to trafficking operations, while ignoring obvious indicators of trafficking activity, bear civil liability for their role in enabling the exploitation of victims.

135.    Federal courts have established that coercion under the TVPA encompasses not only physical force but also "any scheme, plan, or pattern intended to cause belief that failure to perform would result in serious harm," including psychological manipulation and threats. The circumstances of L.M.'s transportation, including her status as an unaccompanied minor being delivered to an adult male at an isolated location, demonstrate the coercive nature of the trafficking scheme that Lyft facilitated.

136.    Lyft's conduct directly caused L.M.'s injuries within the meaning of § 1595(a). But for Lyft's transportation services, L.M.'s trafficking and sexual exploitation could not have occurred as alleged. Federal courts recognize

proximate causation where a defendant's services are essential to the completion of a trafficking offense.

137.     As a direct and proximate result of Lyft's actions and inactions, L.M. has sustained injuries and damages, including, but not limited to economic loss; physical injuries; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; economic loss; psychological damage; loss of relationships; and loss of the ordinary pleasures of everyday life.

## COUNT II

### Negligence

138.     All paragraphs are incorporated by reference.

139.     Lyft owed Plaintiff a duty to exercise reasonable care in the operation of its rideshare business.

140.     Lyft's duty included the obligation to provide reasonably safe transportation services, implement adequate safety measures to protect vulnerable minor passengers,  train drivers to recognize and report potential danger to passengers, supervise driver conduct to ensure passenger safety, enforce policies designed to protect minor passengers, and take reasonable steps to prevent the use of its platform for illegal activities, including trafficking children.

141.    Specifically, Lyft had a duty to ensure L.M.'s safety while interacting with its employees, representatives, and/or agents. Lyft's duty of care to L.M. was heightened because she was an unaccompanied minor.

142.    Lyft's failure to properly screen, train, supervise, and oversee the driver who transported L.M. to M. in direct violation of  policies and procedures created to protect unaccompanied minors like L.M. constitutes a breach of its duty of ordinary care.

143.    Lyft's failure to implement adequate age verification procedures for passengers, coupled with its failure to establish clear protocols for drivers to report suspicious transportation requests to prevent the transportation of minors in dangerous circumstances, constitutes a breach of its duty of ordinary care.

144.    When Lyft's driver accepted and facilitated a transportation request with obvious red flags indicating potential harm to and/or trafficking of a minor, Lyft breached its duty of ordinary care.

145.    Lyft's acts, omissions, and/or commissions, taken separately and/or together, outlined above, constitute negligence.

146.    Lyft's knowledge of prior incidents, legal actions, public reports, and federal warnings required Lyft to take proactive measures to safeguard minors using its platform. By failing to do so, Lyft demonstrated egregious

misconduct and willful neglect of its safety obligations, directly facilitating the horrific exploitation of a vulnerable child.

147.     Lyft breached its duty to L.M. by participating in, and/or facilitating, her trafficking for the purposes of commercial sexual exploitation induced by force, fraud, and/or coercion, through its acts, omissions, and/or commissions.

148.     Despite Lyft's public assurances of prioritizing passenger safety, it failed to protect L.M. from foreseeable and preventable harm.

149.     But for Lyft's negligent conduct, L.M. would not have been transported to M.'s residence where she was raped and sexually exploited.

150.     L.M.'s injuries were a natural and probable consequence of Lyft's negligent conduct.

151.     As a direct and proximate result of Lyft's actions and inactions, L.M. has sustained injuries and damages, including, but not limited to economic loss; physical injuries; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; economic loss; psychological damage; loss of relationships; and loss of the ordinary pleasures of everyday life.

152.     Lyft acted with malice or willful disregard for L.M.'s rights, entitling her to punitive damages.

## COUNT III

### Gross Negligence

153.    All paragraphs are incorporated by reference.

154.    Lyft's conduct constituted gross negligence under Michigan law.

155.    Gross negligence is defined as conduct so reckless as to demonstrate a

substantial lack of concern for whether an injury results. *Maiden v. Rozwood*,

461 Mich. 109, 122 (1999).

156.    Lyft's driver was on notice that L.M. was a minor, female child, and

not the adult man who had ordered the ride.

157.    Lyft's actions and inactions demonstrated gross negligence because it

it:

  a.  Knowingly operated a platform that could facilitate child trafficking

      while failing to implement basic safety measures;

  b.  Deliberately ignored obvious red flags and suspicious circumstances

      surrounding the transportation of unaccompanied minors;

  c.  Failed to adequately train drivers on recognizing signs of child

      trafficking despite known risks;

  d.  Maintained policies prohibiting the transportation of unaccompanied

      minors, but willfully failed to develop clear procedures enforcing such

      policies; and

e.  Prioritized profits over child safety by avoiding implementation of age verification and other protective measures.

158.   By allowing an unaccompanied minor to access and utilize Lyft without proper age verification, and by neglecting to enforce critical safety protocols, Lyft willfully endangered the welfare of a child.

159.   This dereliction of duty not only facilitated the commission of child sex trafficking, facilitating the commission of unspeakable, horrific, and sexually deviant crimes to against L.M., it also constitutes a gross violation of the legal and moral standards expected of a company entrusted with public safety.

160.   As a direct and proximate result of Lyft's actions and inactions, L.M. has sustained injuries and damages, including, but not limited to economic loss; physical injuries; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; economic loss; psychological damage; loss of relationships; and loss of the ordinary pleasures of everyday life.

161.   Lyft acted with malice or willful disregard for L.M.'s rights, entitling her to punitive damages.

## COUNT IV
### Negligent Supervision

158.   All paragraphs are incorporated by reference.

159.    Lyft had a duty to properly supervise, train, and monitor its employees and ensure employees' compliance with all applicable statutes, laws, regulations, and institutional policies, but it  failed to do so and was therefore negligent.

160.    As a direct and proximate result of Lyft's actions and inactions, L.M. has sustained injuries and damages, including, but not limited to economic loss; physical injuries; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; economic loss; psychological damage; loss of relationships; and loss of the ordinary pleasures of everyday life.

161.    Lyft acted with malice or willful disregard for L.M.'s rights, entitling her to punitive damages.

## COUNT V
### Vicarious Liability

162.    All paragraphs are incorporated by reference.

163.    Vicarious liability is indirect responsibility imposed by operation of law where an employer is bound to keep its employees within their proper bounds and is responsible if it fails to do so.

164.     Vicarious liability essentially creates an agency between the principal and its agent, so that the principal is held to have done what the agent has done.

165.     Lyft's driver was employed as and/or held out to be Lyft's agent and/or representative during all times relevant to this Complaint.

166.     Lyft failed to train, supervise, and oversee its driver while retaining them as an employee or agent.

167.     Had Lyft adequately trained, supervised, and overseen its drivers, they would have been alert to deviations from Lyft's policies and procedures governing the transportation of unaccompanied minors and that they needed to immediately such deviations and not transport any minors whose ride parameters deviated from Lyft's policies and procedures.

168.     L.M.'s rape and sexual exploitation was foreseeable due to Lyft's driver's failure to follow Lyft's policies and procedures governing the transportation of unaccompanied minors.

169.     As a direct and proximate result of Lyft's actions and inactions, L.M. has sustained injuries and damages, including, but not limited to economic loss; physical injuries; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; economic loss;

psychological damage; loss of relationships; and loss of the ordinary pleasures of everyday life.

170.    Lyft acted with malice or willful disregard for L.M.'s rights, entitling her to punitive damages.

## COUNT VI

### Intentional Infliction of Emotional Distress

162.    All paragraphs are incorporated by reference.

163.    Lyft received frequent passenger complaints about the negligent and/or criminal conduct of Lyft drivers.

164.    Lyft was aware of the significant risks associated with transporting unaccompanied minors, as evidenced by prior incident reports, legal actions, and governmental notifications highlighting these dangers.

165.    Rather than addressing the danger its enterprise created, Lyft prioritized profits over passenger safety and failed to alert its passengers, including A.M., to the specific risks of human trafficking via Lyft rides.

166.    Despite having been warned of specific risks of its platform being used for human trafficking, Lyft did not implement procedures to adequately screen and monitor its drivers' conduct to identify and terminate drivers who engaged in human trafficking or ignored policies and procedures intended to protect riders from human trafficking.

167.     Lyft failed to ensure the effective implementation of basic safety precautions such as adequate verification and screening of its riders; sufficient training for drivers in identifying and preventing trafficking; and reasonable safeguards to ensure that its drivers complied with Lyft's policies and procedures, such as preventing unaccompanied minor passengers from using its service.

168.     Instead, Lyft continued to market itself as a service that provided "safe" rides to passengers, knowing sufficient measures had not been employed to keep minor passengers safe from trafficking.

169.     By failing to take these and other safety precautions designed to protect minor passengers from the known risk of sexual predators and/or traffickers, Lyft engaged in extreme and outrageous conduct.

170.     Lyft's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

171.     Lyft's conduct was so reckless that any reasonable person or entity would know that emotional distress would result.

171.     The events described above would naturally and probably result in severe emotional distress to a minor child and their parents.

172.    The events described above caused severe emotional distress to L.M. and A.M.

173.    As a direct and proximate result of Lyft's actions and inactions, L.M. has sustained injuries and damages, including, but not limited to economic loss; physical injuries; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; economic loss; psychological damage; loss of relationships; and loss of the ordinary pleasures of everyday life.

174.    Lyft acted with malice or willful disregard for L.M.'s rights, entitling her to punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff L.M., through A.M., prays for judgment against Defendant Lyft as follows:

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C. For any appropriate statutory damages;

D. For costs of this suit;

E. For punitive damages, according to proof, as appropriate to the individual cause of action;

F. For interest based on damages as well as pre-judgment and post-judgment interest as allowed by law;

G. For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues in this case.

DATED: February 10, 2026

Respectfully submitted,

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
Nicole Cote (P86815)
Jessica Moore (OH: 0101098)
ABDNOUR WEIKER LLP
325 E. Grand River Ave., Suite 250
East Lansing, MI 48823
517-994-1776
liz@education-rights.com
nicole@education-rights.com
jessica@education-rights.com

Kristen Feden (NJ: 091312009)
Ashley Ann Garland (NJ: 423002023)
ANAPOL WEISS
130 North 18th Street, Suite 1600

Philadelphia, PA 19103
215-735-1130
kfeden@anapolweiss.com
agarland@anapolweiss.com

*Attorneys for Plaintiff*